IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROY MILLER | |
| Plaintiff, | Civil No.  -              (_____) |
| v. | |
| AMY TYLER LOUTHAN, | TORTS |
| Defendant. | |

## COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES plaintiff Roy Miller ("Roy"), through the undersigned attorney, and very respectfully STATES and PRAYS as follows:

### NATURE OF THE CASE

1. This is an action for damages resulting from defendant's willful and malicious conduct which resulted in abuse of process, defamation and malicious prosecution.

2. Defendant willfully lied to both state and federal authorities, while interviewed in Puerto Rico, in order to provoke a criminal case against Roy.

### JURISDICTION AND VENUE

3. The jurisdiction of this Honorable Court to entertain this matter stems from 28 U.S.C. § 1332(a)(1), in view of the fact that Plaintiff is a resident the state of Iowa, and maintains domicile in the State of Iowa, and Defendant maintains residence and domicile in Puerto Rico. As further alleged herein, the amount in controversy exceeds the threshold amount of $75,000.00, exclusive of interest and costs.

4.  Venue is proper in this District as Defendant resides in the District of Puerto Rico, or otherwise, the acts, events or omissions giving rise to the claims raised herein occurred within the District of Puerto Rico.  28 U.S.C. §§ 1391 (b)(1) and (2).

## PARTIES

5.  Roy is of legal age, a veteran of the United States Armed Forces, single and resident of the state of Iowa.  Roy is also domiciled in Iowa.

6.  Amy Tyler Louthan ("Louthan") is of legal age, resident of Barrio el Verde, Sector Bella Vista, Ramal 9960, km. 1.9, Rio Grande, Puerto Rico, 00745.  Louthan's last known mailing address is HC-5, Box 8905, Rio Grande, Puerto Rico 00745.  Louthan has lived for many years in Puerto Rico and is domiciled in Puerto Rico.

## FACTUAL ALLEGATIONS

### a.  The Relationship Between the Parties

7.  Roy and Louthan, even though not legally married, acted as a married couple and lived together from August 2010 until September 2016.

8.  As a result of their past relationship, the parties had a son together on July 16, 2013 ("Son").

9.  During his relationship with Louthan, Roy was the one who mostly cared for and watched over the Son and Louthan's other children (product of another relationship).

10.  Louthan found out that Roy was entitled to benefits for having suffered injuries while serving in the United States Armed Forces and expelled him from the home where they lived together until he made all necessary efforts to get those benefits.

11.  Roy requested such benefits to please Louthan.

12. Louthan then began trying to convince Roy to take his own life, stating that it was the only way to keep her and her family safe since she claimed that Roy could have a "flashback" and get up in the middle of the night and somehow attack them.

13. Roy has never been aggressive towards his family or anyone in his private life.

14. Louthan made attempts directly with the Veterans Administration to receive benefits as Roy's wife, submitting forged affidavits indicating that they were married even though Roy was legally married to another woman. **Attachment 1.**

15. Roy was arrested in the state of Florida on charges filed against him in the state of Virginia.

16. The charges were related to a situation where Roy was illegally arrested by local police for not having a driver's license while driving a "farm use vehicle" (which does not require a license to drive said vehicle in said State).

17. The arresting police officer, realizing that he had illegally arrested him (during a hearing with a judge), alleged that Roy had assaulted him to justify the arrest. In short, Roy accepted a plea agreement in said case in order to attend to his affairs in Puerto Rico.

18. During the period of time that Roy was imprisoned in the state of Florida, awaiting to be extradited to Virginia to deal with the case discussed above, naturally he met other prisoners.

19. One of the inmates he met fabricated a story that Roy hired him to kill Louthan. Said story was fabricated by said prisoner (who has been in and out of prisons his entire life) in an attempt to reach a deal to reduce his sentence and provoked criminal charges against Roy in Miami.

20. During the investigation of said case, Louthan lied to the federal authorities indicating that Roy mistreated her, among other things. **Attachment 2.**

21. Roy spent nearly 4.5 years defending himself against these charges, until the prosecution finally decided to withdraw the charges due to the weakness of the evidence.

22. On June 27, 2017, the Court of First Instance of Fajardo issued a judgment granting Louthan custody of the Son and did not grant Roy a parent-child relationship because he was in jail, although with the caveat that as soon as Roy's situation changes, he can request modification of said judgement.

23. Louthan has gone to great lengths to keep Roy from having a relationship with his Son, including lying to state and federal authorities.

24. The conditions in which the Son lives with Louthan are not those that would provide the best welfare of the Son; Roy was always the one who took care of the Son and attended to his needs.

25. Louthan has exposed the Son to situations where he is a witness to animal abuse from a very young age.

26. Louthan has also left the Son in the care of strangers who come to his farm to work as volunteers, one of whom has published videos mistreating animals on the farm where Louthan lives; in at least one of the videos showing an animal being tortured, the Son's voice is heard.

27. Roy is an exemplary citizen, he has never used controlled substances and has worked all his life both for the American nation and for his family. The Son has been exposed to an environment not desirable for a minor, with Louthan being a person who has used

controlled and illegal substances in his home in front of his Son and invites strangers to live on his farm and take care of the Son.

**b.      Louthan's Intentional and Malicious Tortious Conduct**

28. Louthan lied to both State and Federal law enforcement with the intention and expectation that it would result in Roy being arrested, prosecuted, convicted and blocked from returning to Puerto Rico.

29. As stated earlier, Roy and Louthan lived together for 6 years.  This union ended September 6, 2016, after Roy refused to kill himself against Louthan's wishes.  Louthan then had the Police called and made a false domestic violence claim.  An officer with Castro as a last name and two other officers visited their home and spoke with Roy but no arrest was made due to a lack of evidence.  Roy left their home on his own accord with the approval of officers on scene.

30. The following day, Sept 7, 2016, Louthan filed a petition for a restraining order claiming Roy was suicidal.  Louthan checked "living together" not the "married" box for her status on said petition.

31. Also, on the morning of Sept 7, 2016, Roy was admitted into the mental health ward at the Veterans Health Administration Hospital suffering from depression and PTSD.  Roy would spend 8 days in lock-down with no access to any computers, cell phones, etc.

32. The next day, Sept 8, 2016, Louthan illegally accessed Roy's Veterans Benefits Association account and uploaded false affidavits of marriage in order to make herself the beneficiary to lifelong benefits in the event of Roy's death.  Literally, one day after claiming she was not married to Roy on a petition for a restraining order, Louthan claimed she was married to Roy.

33. From approximately September 10, 2015, Louthan contacted Roy's doctor and mental health team pretending to be Roy's wife in order to gain information and give false claims of abuse to Roy's mental health team.  Louthan met with Roy's doctors in person and over the phone multiple times.  This negatively affected Roy's treatment and caused more emotional suffering in Roy; specifically, by fabricating evidence, she affected Roy's medical record and treatment negatively.

34. On or around September 19, 2016, Roy was served a temporary restraining order against him which contained a number of false claims made by Louthan.  It was dismissed when it was finally heard in court in November, 2016.

35. On September 28, 2016, accompanied by Officer Gonzalez of the Rio Grande Police Department, Roy went to get his belongings at Louthan's home per the court order.  In violation of the temporary restraining order, Louthan refused access to her home until threatened with arrest. Also, against court order, Louthan had gone through Roy's personal property and stole, hid or destroyed receipts, recordings, legal paperwork as well as approximately $40,000 worth of gold and $600 cash from Roy's personal safe. Also, while there, Officer Gonzalez came across a bag of marijuana, which was illegal at that time in Puerto Rico, and confiscated it.  When Officer Gonzalez and Roy went to the barn, they found Roy's animals in horrible neglect, suffering from malnutrition and unclean living conditions. It appeared that some of the large pigs had resorted to cannibalizing the smaller pigs in order to survive as some of the small ones were missing.

36. In October 2016, Roy came across animal cruelty videos on YouTube of his animals being tortured at Louthan's farm.  In one video, a pet pig is tortured mercilessly and

ultimately killed in the presence of the children.  In other videos, animals are baited into

contacting electrified wires and labelled an experiment in animal psychology.

37. In November, 2016, in an attempt to get visitation with his 3-year-old son at the time, Roy

went to the Puerto Rico Health Department in order to get a birth certificate for his Son

and was informed that there was no birth certificate for his Son.  Thus, Roy and his Son

were alienated due to Louthan's failure/refusal to register the child.  The result in the child

not being registered was that Roy and his Son were not granted any visitation whatsoever

by the Court.  Louthan would go on to delay the registration despite being ordered by the

Court to do so.  Louthan changed her son's name and provided false statements to the

demographics registry under the penalty of perjury in order to delay registration.

38. Throughout the timeframe from October 2016 to March 2017, Roy tried to get law

enforcement from all levels to investigate Louthan's criminal activity, but to no avail.

Finally, in April 2017, the Department of Justice looked into the animal abuse situation

and a summons was ordered for Roy to meet with a prosecutor in Fajardo regarding this

abuse at the hands of Louthan.

39. A few days prior to this scheduled meeting, Roy was arrested on a warrant out of

Hanover Virginia on April 20, 2017.

40. After Roy was extradited to Virginia from Florida, yet another false claim was brought

against Roy in which Louthan played a very large role.

41. According to the Initial Report and Warrant Affidavit of Officer Ryan Olenka-Guerra of

the Miami-Dade Police Department, on June 2, 2017, an inmate, Deivy Rodriguez-

Martinez, at the Metro West Detention Center in Miami, Florida, met with her and two

Assistant State Prosecutors as well as his criminal defense attorney, Simon Steckel, to

discuss how he had been solicited by Roy to commit the murder of his wife, Amy Louthan.

42. Contained within the Initial Report and Warrant Affidavit are many false claims and assertions purportedly provided by Deivy as a result of the information allegedly being given to him by Roy. Many of these false claims purportedly provided by Deivy were corroborated by Louthan in her conversations with State and Federal law enforcement.

43. Louthan intentionally lied to U.S. Marshall Rodriguez on June 4, 2017, by stating that Roy constantly hit and abused her physically and emotionally in a daily basis.

44. According to testimony given on June 4, 2017 by Miami Dade Police Department Detective Ryan Guerra, Louthan told her the following intentionally false statements,:

   a. Ms. Louthan informed Agent Rodriguez that Roy abused her physically and emotionally on a daily basis.

   b. Ms. Louthan further informed that she had a restraining order against Roy from the court in Puerto Rico.  Ms. Louthan explained that she acquired this after Roy threatened to kill her and himself while standing over a hole Roy dug in her backyard.

   c. Roy began to be verbally abusive against Louthan.

   d. Roy continued to be verbally abusive and at times physically abusive.

   e. Roy started to be controlling and refused to let Louthan leave the house for work and refused to let her have friends.

   f. Roy threatened to kill Louthan and himself many times.

g.  In September 2016, Louthan was able to get a restraining order against Roy because of the murder threat by Roy (Roy dug a hole in her backyard and threatened to kill her and himself)"

45. According to the report prepared by FBI Agent Corrigan on December 13, 2017, on December 8, 2017, Louthan told him the following intentionally false statements:

a.  Roy killed many people while he was in the military.

b.  When Roy was deployed to Costa Rica, he killed women and children.

c.  Roy did a lot a bad things in Costa Rica.

d.  Roy often expressed suicidal thoughts.

e.  Roy told Louthan numerous times that he wanted to die.

f.  Roy asked Louthan to kill him on multiple occasions.

g.  Roy was constantly getting in trouble with the law in Virginia.

h.  Louthan believed Roy wanted to move to Puerto Rico to avoid being arrested in the United States.

i.  Louthan learned after arriving in Puerto Rico that Roy was a fugitive at the time of moving.

j.  During this time, Louthan and Roy had numerous domestic disputes and the police responded to their home at least twenty times.

k.  Roy called the police often and falsely reported that Louthan was physically abusing her children and dogs.

l.  Roy was controlling and emotionally abusive towards Louthan.

m.  Roy constantly put Louthan down.

n.  On occasions, Roy would not allow the children to eat.

o.  Sometimes, Roy intentionally deprived Louthan of sleep for weeks at a time.

p.  Louthan considered Roy to be an emotionally abusive partner.

q.  Roy angered easily.

r.  Roy's anger problems caused him to throw and break things inside the home.

s.  Roy broke chairs, plates, and doors and he screamed and yelled at Louthan.

t.  On one occasion, Roy shattered the window of their green Toyota pickup truck.

u.  On another occasion, Roy physically restrained Louthan as she tried to leave their home.

v.  Roy's abuse of Louthan gradually increased throughout the course of their relationship.

w.  Louthan believed Roy became more abusive after he started taking human growth hormone drugs.

x.  After he started taking the human growth hormones, there was more violence in the home (throwing and breaking things), more threats and more weeks of sleep deprivation.

y.  During the last month of their relationship, Roy got angry and broke something on a daily basis.

z.  Roy spoke often to Louthan about committing suicide."

aa.  Roy told Louthan that he wanted her to be the one to kill him and he wanted her to bury him in the backyard.

bb.  Roy dug a hole in the back yard of their home and told Louthan the hole was for Louthan to bury Roy after he committed suicide.

cc.  Roy screamed and yelled at Louthan.

dd. Louthan feared for her safety, so she ran out of the home and into the street, and Roy followed.

ee. While standing in the street, Roy yelled at Louthan, "We are going to die together".

ff. Roy also told Louthan: "You are going to suffer."

gg. Over the last month of their relationship, Louthan feared for her safety and the safety of her children.

hh. Even after Roy left, he continued to call the police and falsely report that Louthan was physically abusing her children and dogs.

ii. Roy's ex-wife ("Tammy") told Louthan that Roy suffered from depression and spoke often about wanting to kill himself.

jj. Tammy told Louthan that while they were married, Roy dug a hole in their backyard and told Tammy that he wanted Tammy to kill him and bury him in the hole.

kk. Tammy told Louthan that Roy was physically abusive towards her on one occasion. (See **Attachment 3** which includes statements made by Tammy).

46. On December 8, 2017, Louthan made the following intentionally false statements in her handwritten statement to the FBI:

a. Roy had always been a little difficult and controlling but he started being much more aggressive.

b. Roy regularly yelled at us, denied meals to the kids, and kept me from sleeping for sometimes a week at a time.

c. Roy began to throw and break things, limit my ability to interact with others outside the house or at work and to restrain me when I tried to leave.

d. Roy became more verbally aggressive, yelling more often, telling my oldest son that it was his fault we didn't get along and threatening to take my youngest son, and our Son so that we would never see him again if I didn't cooperate.

e. Roy blocked me from filling out the paperwork so that Isaac could get a birth certificate.

f. About the morning of Sept 6, 2016, Roy became enraged, packed several large bags, told us he never wanted to see me or his Son again and left on my tractor.

g. Roy had been threatening suicide, saying he wanted to be put down like a dog and buried on the mountain.

h. That she felt sure his real plan was to kill her.

i. Roy said he wanted me to be there when he died at first but soon decided I should be the one to kill him.

j. The night he returned he openly threatened to kill me and that I would suffer.

k. From this point Roy continued to harass us through bogus complaints to the authorities.

l. The kids and I felt a lot of fear that he was going to kill me or injure the kids.

47. On December 5, 2018, Louthan made the following intentionally false statements in her handwritten statement to the Veterans Administration Claims Intake Center about her alleged financial hardship:

a. Roy was abusive to me emotionally, denying me sleep and freedom of movement, and creating a level of fear in the household.

b.  The two older children were denied food and sometimes he would lock them out of the house even making them sleep outside and he would not let them have friends among other issues.

c.  Roy did not like me to work, however he refused to get a job himself.

d.  Roy became friends with the people I worked for and eventually convinced them to terminate my employment locally in my profession of training horses and giving riding lessons.

e.  At the same time Roy said the government was all evil and he refused to allow me to get a birth certificate for our Son.

f.  Roy repeatedly threatened that I would never see Son again if I went against him.

g.  Eventually Roy dug a grave behind the house on the mountain going to the river. He threatened to kill himself and me.

h.  Roy continued his abuse by calling the police and authorities.

i.  Roy craftily turned all my friends and acquaintances against me.

j.  Roy refused until he was jailed to allow the Birth Certificate of his son.

k.  Because of the harassment from Roy it is impossible to get a local job in my profession of horse training and riding lessons.

l.  Before Roy turned them against me, I was making $40 hr in my profession I have studied all my life.

48. On September 7, 2016, Louthan made the following false statements in her petition for a restraining order:

a.  Roy caused me fear of physical injury.

b.  Roy attempted to cause me physical injury.

c.  Roy caused me emotional or psychological injury.

d.  Roy forced me to have sexual relations.

e.  Roy deprived me of adequate rest.

f.  Roy deprived me of freedom of movement.

g.  Roy caused me to fear harm to my property or pets.

h.  Roy caused me to fear injury to other persons.

**C.  Damages Resulting from Louthan's Continuous Intentionally Tortious Conduct**

49. As a result of Louthans intentionally false statements to both federal and state officials, Roy was imprisoned from September 2017 through December 2018.

50. As a result of Louthan's intentionally false statements to both federal and state officials, Roy had to defend himself from charges related to murder for hire against Louthan from September 2017 through November 18, 2021 (when charges were finally dropped for lack of evidence).

51. As a result of Louthan's intentionally false statements to both federal and state officials and abuse of legal process, Roy has not been able to see his Son since year 2016; this while knowing his Son is not cared for appropriately, lives under unacceptable conditions and is not in a healthy and safe environment.

52. Roy has suffered immensely as a result of Louthan's continuous intentionally tortious conduct described in this complaint; emotional damages suffered by Roy as a result of Louthan's malicious conduct is estimated in an amount no less than $7,000,000.

53. Emotional damages include fear, sadness, lack of sleep, anxiety and incredible emotional pain as a result of being alienated from his Son, incarcerated and prosecuted.

### D.     Louthan's Motive's For Her Intentional Tortious Conduct

54. By getting Roy prosecuted and incarcerated, Louthan would delay being prosecuted for her crimes.

55. By getting Roy prosecuted and incarcerated, Louthan was able to maintain possession of Roy's property.

56. By getting Roy prosecuted and incarcerated, Louthan was able to sever all ties between her Son and his father as she was granted full custody in all aspects.

57. By getting Roy prosecuted and incarcerated, Louthan was able to avoid public exposure of her criminal behavior and abusive personality and behavior in her home.

58. By getting Roy prosecuted and incarcerated, Louthan was able to fraudulently convince a Court to grant Roy's real estate property to Louthan through a default judgement (by providing a false address and jail number to notify Roy).

## FIRST CLAIM FOR RELIEF
## TORTS-ABUSE OF PROCESS

59. Paragraphs 1 to 58 are hereby incorporated by reference.

60. Section 1802 of the Civil Code of Puerto Rico of 1930 states: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. Tit. 31, § 5141. In _Clemente v. United States_, 426 F. Supp. 1, 2 (D.P.R. 1977) the Federal District Court of Puerto Rico stated: "suffice it to say that [§ 1802] establishes what is probably the broadest basis for tort liability in any jurisdiction of the United States."

61. The intentionally tortious acts expressed in this complaint resulted in a continuous abuse of process from Louthan that resulted in Roy suffering continuous emotional damages in an amount no less than $7,000,000.

62. Roy asks this Honorable Court to grant no less than $7,000,000 in emotional damages.


**SECOND CLAIM FOR RELIEF**
**TORTS-MALICIOUS PROSECUTION**

63. Paragraphs 1 to 62 are hereby reiterated and incorporated by reference.

64. Section 1802 of the Civil Code of Puerto Rico of 1930 states: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. Tit. 31, § 5141. In Clemente v. United States, 426 F. Supp. 1, 2 (D.P.R. 1977) the Federal District Court of Puerto Rico stated: "suffice it to say that [§ 1802] establishes what is probably the broadest basis for tort liability in any jurisdiction of the United States."

65. The intentionally tortious acts expressed in this complaint resulted in a continuous malicious prosecution from Louthan that resulted in Roy suffering continuous emotional damages in an amount no less than $7,000,000.

66.  Roy asks this Honorable Court to grant no less than $7,000,000 in emotional damages.


**THIRD CLAIM FOR RELIEF**
**TORTS-DEFAMATION**

67. Paragraphs 1 to 66 are hereby incorporated by reference.

68. Section 1802 of the Civil Code of Puerto Rico of 1930 states: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. Tit. 31, § 5141. In Clemente v. United States, 426 F. Supp. 1, 2 (D.P.R. 1977) the Federal District Court of Puerto Rico stated: "suffice it to say that [§

1802] establishes what is probably the broadest basis for tort liability in any jurisdiction of the United States."

69. The intentionally tortious acts expressed in this complaint resulted in a continuous defamation from Louthan that resulted in Roy suffering continuous emotional damages in an amount no less than $7,000,000.

70.  Roy asks this Honorable Court to grant no less than $7,000,000 in emotional damages.

**FOURTH CLAIM FOR RELIEF**
**ATTORNEY'S FEES AND EXPENSES**

71. Paragraphs 1 to 70 are hereby incorporated by reference.

72. As a result of the Louthan's willful conduct, Roy is entitled to recover attorneys' fees and expenses incurred in the prosecution of this case and which are estimated in an amount not less than $100,000.00.

**WHEREFORE,** Roy respectfully request that the Honorable Court enter Judgment in his favor as follows:

1. Granting emotional damages in an amount no less than $7,000,000;

2. Ordering Louthan to compensate Roy in an amount not less than $100,000.00, for all attorneys' fees and other expenses; and

3. Awarding Roy any such other and further relief as is just and equitable.

4. Roy requests a jury trial on all issues so triable.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico, this 14th day of November 2022.

s/ Santiago Soler Martinez
**Santiago Soler Martinez**
**USDC-PR 302512**
PMB 117, 100 Grand Paseo Blvd. Ste. 112
San Juan, PR 00926-5955
Tel. 787-525-5781
ssoler@ssmlawpr.com

Attachment 1

| SPECIAL APPORTIONMENT DECISION | | 1. STATION<br>San Juan (355) | |
|---|---|---|---|
| 2. NAME OF VETERAN<br>ROY E MILLER | | 3. FILE NO.<br>C 481942565 | |
| 4. NAME OF CLAIMANT<br>AMY LOUTHAN | | 5. RELATIONSHIP OF CLAIMANT<br>EX-WIFE/CUSTODIAN OF CHILD | |

| 6. VA BENEFIT | Dis. Pension | DIC | Death Comp. | Death Pen. | Retirement |
|---|---|---|---|---|---|
| Dis. Comp. X | | | | | |

| Line No. | Item | Veteran or Widow | Claimant(s) |
|---|---|---|---|
| 1. | Present Monthly Award (VA benefit) | $1,767.69 | $0.00 |
| 2. | Other Monthly Income | $0.00 | $0.00 |
| 3. | Total Monthly Income | Unknown | $0.00 |
| 4. | Monthly Expenses | $4,600.00 | $2,590.00 |
| 5. | Net Income After Expenses | -$2,832.31 | $0.00 |
| 6. | Liquid Assets | unknown | NONE |
| 7. | Other Assets | unknown | NONE |

### SPECIAL NEEDS

| 7A. Veteran or Widow<br>Hardship shown on VAF 0788 | 7B. Claimant(s)<br>Did not show hardship |
|---|---|

On November 8, 2018, Mrs. Amy Louthan, requested an apportionment of the veteran's benefits on behalf of veteran child Isaac and submitted only her expenses on VA Form 21-0788. On May 28, 2019 we sent a development letter to claimant and veteran; claimant Amy did reply with supporting documents pertaining to child support. On June 12, 2019 due process was sent to the veteran requesting his income and expenses. Veteran replied on VAF 21-4138 and VAF 21-0788 denoting financial hardship due to current marital status issues. Veteran replied to our letter. Based on the evidence of record and the evidence submitted by claimant, we decided that the amount of $354.00 cannot be granted.

**Laws and Regulations**:
CFR 3.450 (a)

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION

(1) All or any part of pension or compensation benefits payable to a veteran may be apportioned:
(ii) If the veteran is not residing with his or her spouse, or if the veteran's children are not residing with the veteran and the veteran is not reasonably discharging his or her responsibility for the spouse's or children's support.

CFR 3.452 (a)

Veterans' benefits may be apportioned:

(a) If the veteran is not residing with his or her spouse or his or her children and a claim for apportionment is filed for or on behalf of the spouse or children.

### Decision:

Apportionment for Mrs. Amy Louthan, on behalf of veteran's child Isaac is denied.

Mrs. Amy Louthan demonstrated that she does not show financial hardship. The veteran failed to reply to our letter, thus, it is inferred that the granting of apportionment will cause him a financial hardship and that he does not contribute to her financial support due to marital status.

| 9. Apportionment<br>Denied   X        Increased<br>Allowed          Terminated | | 10.  Amount Allowed<br>    $0.00 | |
|---|---|---|---|
| 11A.  Submitted By: | 11B.  Date | 12A. Approved By | 12B.  Date |
| Elias Garcia | 6/25/2019 | | |

**VA Form 21-441**

AFFIDAVIT OF MARRIAGE

COMES NOW, Roy Eldon, Miller, the affiant, who is of lawful age and sound mind, who is a competent witness and is telling the truth, voluntarily relating the following first hand knowledge of the facts and stating that these facts are true and represent the best of my knowledge.

On August 29, 2010, Roy Eldon Miller and Amy Tyler Louthan exchanged vows of Holy Matrimony before God.

The marriage ceremony was conducted at Frog Level Farm, 234 West River Road, King William, Virginia.

The marriage ceremony was conducted in accordance with our religious beliefs, binding us as husband and wife.

The ceremony was witnessed by Cindi Elder as well as Roy Eldon Miller and Amy Tyler Louthan.

Roy Eldon Miller and Amy Tyler Louthan have lived as husband and wife from August 29, 2010 and intend to remain married.

*Roy E. Miller 7-23-16*

County of Richmond
Commonwealth/State of VA
I certify this is a true and ...
I am acknowledging ...
Complete 23rd day of July 16
Notary's ...
My Commission Expires 6/30/17
225.1125

| Date of Supplement | | | | | | | Agency Report Number | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MIAMI-DADE POLICE DEPARTMENT | | | | 170602209005 | | |

| Original Date Reported | Original Primary Offense Description | | Victim #1 Name | | | Original NCIC/UCR Code |
|---|---|---|---|---|---|---|
| 06-02-17 | Confidential Investigation | | N/A | | | |
| Original OFFENSE Location | Primary Offense Changed To | | A - Attempted C - Committed | New Statute Violation Number | | New NCIC/UCR Code |
| 9105 NW 25 ST | | | | 7----------------7 | | |

her farm. Ms. Louthan further stated that she is not friends with them because Miller has turned them against her.

Ms. Louthan guided the Agents to Ether's Kennel location which is calle P-1, Rio Grande, Puerto Rico 00745. The

Agents responded to Ether's location and attempted to make contact after numerous attempts at the gate they were

unsuccessful in getting anyone to open the door.

While the Agents were on scene I was able to briefly speak with Ms. Louthan and confirm the same information

from her own voice. I spoke with Ms. Louthan several times after the agents left her home in order to verify

information on the history between her and Mr. Miller and all of the legal proceedings that have occurred between

them.

**Additional information learned (stated by Ms. Louthan)**

- Louthan and Miller have been together for approximately 6 years
- Louthan and Miller lived in Virginia (where Louthan owned a farm)
- Miller started getting in trouble with the police
- Miller began to be verbally abusive after he was arrested for the battery on a Police Officer
- Louthan and Miller moved to Puerto Rico when Louthan was pregnant
- Miller continued to be verbally abusive and at times physically abusive
- Miller started to be controlling and refused to let Louthan leave the house for work and refused to let her have friends
- Miller threatened to kill Louthan and himself many times



| Suspect Code S = Suspect  A - Arrestee | Code # | Offense Indicator 1 #1  3 Both 2 #2 | Residence Type 4 City     3 Florida 2 County  4 Out of State | Citizenship | Drug Indication 1 Yes  3 Unknown 2 No | Alcohol Indication 1 Yes  3 Unknown 2 No |
|---|---|---|---|---|---|---|
| Drug Activity          S Sell N N/A              B Buy P Possess        T Traffic | R Smuggle D Deliver E Use | K Dispense/ Distribute | M Manufacture/ Produce/ Cultivate | Z Other | Drug Type N N/A A Amphetamine | B Barbiturate C Cocaine E Heroin | H Hallucinogen M Marijuana O Opium/Dev | P Paraphernalia Equipment S Synthetic | U Unknown Z Other |
| □ 1 Parent □ 2 Legal Guardian □ 3 Other | Name of Parent or Custodian (Last, First, Middle) | | | | | Residence Phone |
| Address (Street, Apt. Number) | | (City) | | (State) | (Zip) | Business Phone |

| Notified By: (Name) | | | Date | Time | Juvenile Disposition 1. Handled/Processed Within Dept. and Released | | 2. Turned Over to DYS/CYF 3. Incarcerated (County Jail) |
|---|---|---|---|---|---|---|---|
| Released To: (Name) | | | | Relationship | | Date | Time |

| Person/Unit Notified | | Time | Related Report Number(s) | | | |
|---|---|---|---|---|---|---|
| Officer (s) Reporting O. Ryan-Guerra | | | ID. Number(s)/Locator Code 7628-81 | | Unit HQ5481 | Date 06-05-17 |
| Officer Reviewing (if Applicable) SGT. L. COMEAU | ID. Number 5735 | Routed To | Referred To | Assigned To | By | Date |
| Case Status | Clearance Type 1. Arrest 2. Exceptional | 1. Unfounded 4. Open Pend. | A – Adult J - Juvenile | Date Cleared | Jail Number | Number Arrested 0 |
| Exception Type 1. Extradition Declined | 2. Arrest on Primary Offense Secondary Offense Without Prosecution | 3. Death of Offender 4. V/W Refused to Cooperate | 5. Prosecution Declined 6. Juvenile / No Custody | | OBTS Number | Page 1 of 6 |

XX.XX.XX-XXXX 1/7

Attachment 3

Name:          Tamara Faye Nichols (previous Tamara Nichols Miller)
Address:       8011 Ellendale Drive, Mechanicsville, VA 23116
Date of Birth:  02/28/1966

I, Tamara Faye Nichols was previously married to Roy Eldon Miller for approximately 17 years. The character of this man is impeccable. He is a true patriot and served his Country with every ounce of his being. He received numerous accommodations as a Navy Seal and as an Air Force Combat Controller.

He never drank, smoked or did drugs. He lived a clean and wholesome lifestyle as he was brought up. He was kind to all people and animals (he wouldn't even harm a spider for me; he took it outside to be free). He was a truthful and loyal husband. He never raised a hand to me or our children. He was incredibly helpful to friends and neighbors and would often use his tractor to plow people's driveway of snow and take kids sledding. He helped an older neighbor whose husband died as a laborer on her farm with caring for the animals. He even built her a barn by hand (with one hand injured) to help her out. He was the best father I could have wished for our kids. He built a backyard paradise for them and the neighbor kids. I would often have the neighbor boys who were older than our daughters knock on the door and ask me "Can Mr. Roy come out and play?"

Since we have been apart, he has become a friend. I still see all of the same traits in him today as I did all those years we were together.


*Tamara F. Nichols*

### AFFADAVIT OF TRUTH
#### Of Tamara N. Brown

STATE OF VIRGINIA          )
                                   ) SS

COUNTY OF HANOVER  )

Comes now, Tamara N. Brown, the living woman, your affiant, being competent to testify and being over the age of 21 years of age, after being duly sworn according to law to tell the truth to the facts stated herein and believes these facts to be true to the best of her knowledge.

1.  In 17 years of marriage, Roy Miller never abused me or our children.
2.  In 17 years of marriage, Roy Miller never threatened suicide to me.
3.  His current wife Tyler did call me on 09/09/2016 requesting me to call her. I did return her call.
4.  His current wife Tyler did call me on 10/06/2016 requesting me to call her for more discussion. I did not return her call.

Further, Affiant sayeth naught.

WITNESS the following signatures and seals:

_Tamara N. Brown_

Tamara N. Brown

Signed this day _____ October 14, 2016 _____

COMMONWEALTH OF VIRGINIA,
CITY/COUNTY OF ___ Hanover ___, to-wit:

The foregoing instrument was acknowledged before me this ___ 14 ___ day of October, 2016 by Tamara N. Brown

NOTARY PUBLIC _Virginia L. Chenault_
My Commission Expires on_____ 8-31-2017 _____

VIRGINIA L. CHENAULT
Notary Public
Commonwealth of Virginia
My Commission Expires August 31, 2017
Commission ID# 7268095